IN THE UNITED STATES DISTRICT COURT FOR THE
SOUTHERN DISTRICT OF GEORGIA
AUGUSTA DIVISION

FILED
U.S. DISTRICT COURT
AUGUSTA DIV.

20 MAR 23 AM 11:28

CLERK J. Hodge
SO. DIST. OF GA.

JUSTIN STROLIS,

    Plaintiff,

      v.

LUCAS HEISE, Individually, for
Actions Taken Under Color of
Law, as a Deputy with the
Augusta Richmond County
Sheriff's Department,

    Defendant.

CV 118-137

**O R D E R**

Before the Court is Defendant Lucas Heise's ("Defendant")
motion for summary judgment (Doc. 14). The Clerk of Court gave
Plaintiff Justin Strolis ("Plaintiff") notice of the motion for
summary judgment and informed Plaintiff of the summary judgment
rules, the right to file affidavits or other materials in
opposition, and the consequences of default. (Doc. 16.) Thus,
the notice requirements of Griffith v. Wainwright, 772 F.2d 822,
825 (11th Cir. 1985), are satisfied. The time for filing materials
in opposition has expired, and the motion is ripe for
consideration.[1]

---

[1] The Court notes Plaintiff's pending motion to strike certain portions of Chief
Dekmark's expert report (Doc. 14-6). (Doc. 17.) In evaluating Defendant's
motion for summary judgment, however, the Court declines to consider Chief
Dekmark's expert report; thus, it finds Plaintiff's motion to strike (Doc. 17)
moot.

## I. BACKGROUND

### A. Vehicle Break-Ins

Early in the morning on June 12, 2015, ten vehicles were reportedly broken into on Ramsgate Drive in Augusta, Georgia, and Richmond County officers responded to the scene at 7:11 a.m. (Vehicle Break-Ins Investigator File, Doc. 25-4, at 1-4; see generally, Strolis Case File, Doc. 25-3; Def.'s Br. Supp. Mot. for Summ. J., Doc. 14-1, at 1.) The following belongings were reported stolen: a total of $250, two driver's licenses, a school ID card, six credit or debit cards, a purse, a wallet, and a Tag Heuer watch. (Strolis Case File, at 4, 8, 9, 12, 20, 24, 25.)

On June 15, 2015, Defendant was assigned to investigate the reported crime, and he began by reviewing the reports from the officers who responded to the break-ins. (Id. at 1; Vehicle Break-Ins Investigator File, at 4; Def.'s Br. Supp. Mot. for Summ. J., at 1.) From those reports, Defendant viewed the video from one home's exterior-facing camera, which captured a male approximately 5'11" to 6' tall break into vehicles in the driveway. (Vehicle Break-Ins Investigator File, at 5-7.) Two of the stolen credit cards were used. Card 1 was used at a Raceway gas station located at 3021 Washington Road and on Match.com to pay for an account for "Joshua Dominguez" ("Dominguez"). (Strolis Case File, at 9; Vehicle Break-Ins Investigator File, at 6, 8, 11-12.) Card 2 was used to pay a Boost Mobile account. (Strolis Case File, at 13;

Vehicle Break-Ins Investigator File, at 6, 15, 30.) Cards 1 and 2 were taken from cars parked on opposite sides of Ramsgate Drive. (See Ramsgate Map, Doc. 25-12.)

Defendant subpoenaed Match.com and Sprint Communications, the owner of Boost Mobile, for all records associated with payments made using Cards 1 and 2. (Vehicle Break-Ins Investigator File, at 9-10.) Both subpoenas returned records connected to Dominguez. (Id. at 11-12, 15.)

Defendant ran a criminal background check on Dominguez, which showed his prior convictions, including one for "entering an automobile with the intent to commit a theft" and six "for Financial Transaction Card Fraud." (Id. at 14.) Defendant applied for and received warrants for Dominguez's arrest and uploaded the warrants into the Georgia Crime Center Information Center. (Id. at 14.) Additional records received showed "[t]he IP address that was used to log [i]nto Joshua Dominguez's Match.com account belongs to Masters Inn located at 3027 Washington Rd." (Id. at 16.)

Defendant then received the call records from Dominguez's Boost Mobile phone. (Id. at 17-19, 22.) The records revealed that between June 11, 2015, and July 1, 2015, Dominguez called or received calls from Plaintiff 124 times. (Id. at 19-20.) On July 1, 2015, Defendant asked Plaintiff to come to the Richmond County Sheriff's Office for an interview, and Plaintiff came in later that day. (Id. at 20.)

3

## B. Plaintiff's Interview

The interview is discussed in further detail throughout this Order, but the Court, here, provides a brief summary. Plaintiff admitted to being friends with Dominguez and, although not altogether clear about the dates, admitted to being with Dominguez sometime between June 10-12, 2015. (Pl.'s Int.[2] Pt. 2, at 9:20.) Throughout the interview, Plaintiff repeated to Defendant the same story about his time with Dominguez. Plaintiff stated that Dominguez was coming to Augusta from Atlanta and Dominguez called him to hang out while he was in town. (Id. at 7:47-8:07.) The first day they hung out, Plaintiff left work around 4:30 p.m., connected with Dominguez and Dominguez's mother at Plaintiff's home where Plaintiff lives with his father, Dominguez's mother offered to pay for Dominguez and Plaintiff to stay at the Masters Inn, and Dominguez and Plaintiff checked in to the Masters Inn. (Id. at 7:45-8:53.) Later that evening, they went out to a bar in downtown Augusta, and went back to the Masters Inn. (Id.) The next morning, Dominguez drove Plaintiff home and they did not hang out the rest of the time Dominguez was in Augusta, although they did speak on the phone regularly. (Pl.'s Int. Pt. 1, 38:55-39:04;

---

[2] The Court examined the video recording of Defendant's interview of Plaintiff that is broken into three parts and the audio recording of Defendant's interview of Dominguez on the CD that Defendant supplied to the Clerk's office. (See Notice of Filing, Doc. 15.)

Pl.'s Int. Pt. 2, at 8:49-9:01; Vehicle Break-Ins Investigator File, at 19-20.)

In the interview, Plaintiff appeared confused about the exact dates he hung out with Dominguez. At one point, Defendant asked whether it could have been the 12th when they checked into the Masters Inn, to which Plaintiff responded, "I believe it was the 12th." (Pl.'s Int. Pt. 2, at 9:22-9:33, 10:01-10:13.) Later on, Plaintiff stated that he met up with Dominguez and the events outlined above occurred on the Eleventh. (Id. at 28:07-28:30.) Defendant asked, "Are you sure this was the [Eleventh], relatively speaking?" and Plaintiff responded, "Relatively speaking, I can't be 100%." (Id. at 28:30-28:40.) Defendant asked Plaintiff to verify the date using his phone log, and Plaintiff stated that he was unable to verify because he deleted the information. (Id. at 28:40-29:12.) The date Plaintiff and Dominguez initially met up appears to have actually been June 10, 2015. (Pl.'s Resp. Def.'s St. Undisputed Mat. Facts, Doc. 25-1, at 4, 11.)

Plaintiff consistently denied knowing anything about "the cars" on Ramsgate Drive but admitted to knowing Dominguez broke into cars more generally. (See, e.g., Pl.'s Int. Pt. 1, at 34:12-34:25; Pl.'s Int. Pt. 2, 5:00-5:30, 9:23, 22:45-23:12, 25:38-26:59.) Plaintiff also told Defendant that Dominguez broke into vehicles near Ramsgate Drive seven years ago. (Pl.'s Int. Pt. 2, at 26:06-26:59.) Defendant seemed to believe Dominguez and

Plaintiff broke into the cars on Ramsgate Drive sometime after going to the bar downtown. (Id. at 9:00–9:30.) Defendant knew the crimes occurred early in the morning on June 12, 2015, and stated, "All these crimes are committed between, eh, 1:00 in the morning and 3:30 when he made all the charges." (Pl.'s Int. Pt. 3, at 00:11–00:21.) Then Defendant stated, "He was with you that night at the Masters Inn because guess what they got." (Id. at 00:42–00:47.) Plaintiff responded, "Surveillance." (Id. at 00:49.)

## C. Information Received Between Interviews

The morning after interviewing Plaintiff, Defendant went to the Masters Inn "in an attempt to confirm that Dominguez and [Plaintiff] rented a room at the Master[]s Inn on [June 11, 2015, through June 12, 2015]." (Vehicle Break-Ins Investigator File, at 23.) Defendant spoke with the general manager who explained that Dominguez's mother "rented [a room] for [three] nights from [June 10, 2015, through June 12, 2015]." (Id.) The general manager informed Defendant "that he only held video for [ten] days and no longer had any video from [June 10, 2015, through June 13, 2015]." (Id.)

Defendant also received phone records from Plaintiff's phone from June 11, 2015, through June 12, 2015. (Id. at 24–28.) Verizon Wireless, Plaintiff's cell phone service provider, was "unable to provide any [location information] on the cell phone due to the

6

information being deleted from their servers within [ten] days of the date of [June 12, 2015]." (Id. at 22-23.)

## D. Dominguez's Interview

In the evening after interviewing Plaintiff, Defendant was informed Dominguez was arrested in Duluth, Georgia. (Vehicle Break-Ins Investigator File, at 21-22.) On July 7, 2015, Defendant drove to the Gwinnett County Jail to interview Dominguez along with a Gwinnett County Officer, Detective Michael Hardin. (Id. at 20, 28-29.) Early in the interview, Dominguez admitted to breaking into the cars on Ramsgate Drive. (Dominguez's Int., at 25:15-25:22.) Defendant asked if Plaintiff was with Dominguez the night of the break-ins, and Dominguez responded, "Possibly." (Id. at 28:40-28:46.) Defendant asked if Plaintiff "goes into the cars too?" (Id. at 30:50.) Dominguez responded, "He was working the other side of the street." (Id. at 30:51.) A few minutes later Defendant inquired whether Plaintiff broke into cars any other night and Dominguez responded that he only did it on the Eleventh. (Id. at 38:00.) Defendant also asked, "And [Plaintiff] was with you for the entire Ramsgate?" (Id. at 38:05.) Dominguez replied, "He went back to the car for about two hours afterwards. Said he was tired." (Id. at 38:07-38:15.)

## E. Plaintiff's Arrest

On July 8, 2015, Defendant asked Plaintiff to come in for another interview, and Plaintiff refused. (Vehicle Break-Ins

Investigator File, at 32.)  The next day, Defendant applied for and received a warrant to arrest Plaintiff for entering an automobile to commit a theft.  (Id. at 33; Arrest Warrant,[3] Doc. 14-4.)  Later that same day, Defendant and another detective went to the grocery store where Plaintiff worked and made the arrest. (Vehicle Break-Ins Investigator File, at 34.)

## F. Nolle Prosequi

Later, .Dominguez "pled guilty to ten counts of entering an automobile with intent to commit a theft, three counts of financial transaction card fraud, and two counts of financial transaction card theft."  (Def.'s St. Undisputed Mat. Facts, Doc. 20, ¶ 11 (undisputed).)  On August 3, 2016, the State moved for and received entry of a nolle prosequi order for Plaintiff because "[i]nformation not available at the time of arrest/indictment indicates that there is no longer sufficient evidence to prove guilt beyond a reasonable doubt."  (Nolle Prosequi Order, Doc. 14-7.)

## G. Procedural Posture

On August 3, 2018, Plaintiff filed this Complaint in the State Court of Richmond County, Georgia.  (Compl., Doc. 1-1, at 3-17.) On August 28, 2018, Defendant removed the case to this Court. (Notice of Removal, Doc. 1.)  On June 17, 2019, Defendant moved

---

[3] See discussion on validity of arrest warrant *infra* Section III(2).

for summary judgment. (Def.'s Mot. for Summ. J., Doc. 14.) Plaintiff responded (Pl.'s Resp. Opp'n Def.'s Mot. for Summ. J., Doc. 25), Defendant replied (Def.'s Reply Supp. Mot. for Summ. J., Doc. 31), and Plaintiff sur-replied (Pl.'s Sur-Reply Opp'n Def.'s Mot. for Summ. J., Doc. 33). For the following reasons, the Court **GRANTS** Defendant's motion for summary judgment as to all of Plaintiff's federal claims. Plaintiff's state claims are **HEREBY REMANDED** to the State Court of Richmond County, Georgia.

## II. SUMMARY JUDGMENT STANDARD

Summary judgment is appropriate only if "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). Facts are "material" if they could "affect the outcome of the suit under the governing law," Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986), and a dispute is genuine "if the non[-]moving party has produced evidence such that a reasonable factfinder could return a verdict in its favor." Waddell v. Valley Forge Dental Assocs., Inc., 276 F.3d 1275, 1279 (11th Cir. 2001). The Court must view factual disputes in the light most favorable to the non-moving party, Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986) (citation omitted), and must "draw all justifiable inferences in [the non-movant's] favor." United States v. Four Parcels of Real Prop., 941 F.2d 1428, 1437 (11th Cir. 1991)

(citation, internal quotation marks, and internal punctuation omitted). The Court should not weigh the evidence or determine credibility. Anderson, 477 U.S. at 255. But "[t]he mere existence of a scintilla of evidence in support of the [non-movant]'s position will be insufficient" for a jury to return a verdict for the non[-]moving party. Id. at 252; accord Matsushita Elec. Indus., 475 U.S. at 587 ("When the moving party has carried its burden under Rule 56(c), its opponent must do more than simply show that there is some metaphysical doubt as to the material facts." (footnote omitted)); Gilliard v. Ga. Dep't of Corr., 500 F. App'x 860, 863 (11th Cir. 2012).

The moving party has the initial burden of showing the Court, by reference to materials in the record, the basis for the motion. Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). Because the standard for summary judgment mirrors that of a directed verdict, the initial burden of proof required by either party depends on who carries the burden of proof at trial. Id. at 322–23. When the movant does not bear the burden of proof at trial, it may carry the initial burden in one of two ways — by negating an essential element of the non-movant's case or by showing that there is no evidence to prove a fact necessary to the non-movant's case. See Clark v. Coats & Clark, Inc., 929 F.2d 604, 606–08 (11th Cir. 1991) (citing Adickes v. S.H. Kress & Co., 398 U.S. 144, 153, 157, 160 (1970); Celotex Corp., 477 U.S. at 320, 322–25).

If — and only if — the movant carries its initial burden, the non-movant must "demonstrate that there is indeed a material issue of fact that precludes summary judgment." Id. at 608. When the non-movant bears the burden of proof at trial, the non-movant must tailor its response to the method by which the movant carries its initial burden. For example, if the movant presents evidence affirmatively negating a material fact, the non-movant "must respond with evidence sufficient to withstand a directed verdict motion at trial on the material fact sought to be negated." Fitzpatrick v. City of Atlanta, 2 F.3d 1112, 1116 (11th Cir. 1993). On the other hand, if the movant shows an absence of evidence on a material fact, the non-movant must either show that the record contains evidence that "was 'overlooked or ignored' by the moving party," id. at 1116 (quoting Celotex, 477 U.S. at 332 (Brennan, J., dissenting)), or "come forward with additional evidence sufficient to withstand a directed verdict motion at trial based on the alleged evidentiary deficiency" id. at 1116—17. The non-movant cannot carry its burden by relying on the pleadings or by repeating conclusory allegations contained in the complaint. See Morris v. Ross, 663 F.2d 1032, 1033—34 (11th Cir. 1981). Rather, the non-movant must respond with affidavits or as otherwise provided by Federal Rule of Civil Procedure 56. In reaching its conclusions herein, the Court has evaluated the Parties' briefs, other submissions, and the evidentiary record in this case.

### III. DISCUSSION

Plaintiff brings malicious prosecution claims against Defendant under state law, Count I, and federal law, Count II. (Compl., ¶¶ 88-94.) The Court begins with (A) Plaintiff's federal malicious prosecution claim, then discusses (B) Plaintiff's state malicious prosecution claim.

### A. Federal Malicious Prosecution Claim

Defendant argues Plaintiff's federal claim of malicious prosecution fails because Defendant is entitled to qualified immunity. (Def.'s Br. Supp. Mot. for Summ. J., at 8-9.) For the following reasons, the Court agrees. Qualified immunity is a judicially created affirmative defense under which "government officials performing discretionary functions generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982). For qualified immunity to apply, a public official first must show "he was acting within the scope of his discretionary authority when the allegedly wrongful acts occurred." Lumley v. City of Dade City, 327 F.3d 1186, 1194 (11th Cir. 2003) (citations omitted). To determine whether a government official was acting within the scope of his discretionary authority, courts consider whether the official "was (a) performing a legitimate job-related function (that is,

pursuing a job-related goal), (b) through means that were within his power to utilize." Holloman ex rel. Holloman v. Harland, 370 F.3d 1252, 1265 (11th Cir. 2004). Once a defendant establishes that he was "acting within [his] discretionary authority, the burden shifts to the plaintiff to demonstrate that qualified immunity is not appropriate" by showing the facts as pleaded by the non-movant reveal that the defendant's conduct violated a constitutional right and that right was clearly established. Bowen v. Warden, Baldwin State Prison, 826 F.3d 1312, 1319 (11th Cir. 2016); Lumley, 327 F.3d at 1194.

The Eleventh Circuit recognizes "malicious prosecution as a violation of the Fourth Amendment and a viable constitutional tort cognizable under § 1983." Wood v. Kesler, 323 F.3d 872, 881 (11th Cir. 2003). As a Section 1983 claim, malicious prosecution "provide[s] a broad remedy for violations of federally protected civil rights." Blue v. Lopez, 901 F.3d 1352, 1359-60 (11th Cir. 2018). Malicious prosecution requires a plaintiff to "prove (1) the elements of the common law tort of malicious prosecution[] and (2) a violation of [his] Fourth Amendment right to be free from unreasonable seizures." Black v. Wigington, 811 F.3d 1259, 1266 (11th Cir. 2016). "The common[]law elements include: (1) a criminal prosecution instituted or continued by the present defendant; (2) with malice and without probable cause; (3) that terminated in the plaintiff accused's favor; and (4) caused damage

13

to the plaintiff accused." Id. The "unreasonable seizure" element
of a malicious prosecution claim "requires a seizure 'pursuant to
legal process.'" Id. at 1267 (quoting Heck v. Humphrey, 512 U.S.
477, 484 (1994)). "Legal process includes an arrest warrant."
Id.

Both Parties appear to assume Defendant was engaged in a
discretionary function when he investigated the crime, applied for
an arrest warrant, and arrested Plaintiff. The Court finds
Defendant engaged in discretionary functions when he performed the
acts of which Plaintiff complains. Stanton v. McIntosh Cty., No.
CV 209-092, 2010 WL 11526845, at *6 (S.D. Ga. Sept. 29, 2010)
(quoting Brock v. City of Zephyrhills, 232 F. App'x 925, 927-28
(11th Cir. 2007)) ("The acts of obtaining and executing a warrant
for an arrest . . . qualify as discretionary functions of law
enforcement officers."). As such, the burden shifts to Plaintiff
to show qualified immunity is inappropriate because Defendant's
conduct violated a constitutional right and that right was clearly
established. It is a clearly established right under the Fourth
Amendment that arrests must be supported by probable cause.
Killmon v. City of Miami, 199 F. App'x 796, 799 (11th Cir. 2006)
(stating that it is clearly established that arrests must be
supported by probable cause and in the qualified immunity context,
an officer maintains immunity "if there was arguable probable cause
to make the arrest"). Thus, "[i]n the context of an arrest, the

14

Eleventh Circuit . . . frames this inquiry as whether an officer had 'arguable probable cause.'" <u>Strickland v. City of Dothan</u>, 399 F. Supp. 2d 1275, 1291 (M.D. Ala. Nov. 8, 2005) (quoting <u>Montoute v. Carr</u>, 114 F.3d 181, 184 (11th Cir. 1997)).

Plaintiff argues Defendant is not entitled to qualified immunity because Defendant (1) acted without arguable probable cause and (2) fabricated evidence on the arrest warrant.

### 1. Arguable Probable Cause

Plaintiff argues Defendant violated his constitutional right to be free from malicious prosecution when he arrested him without probable cause. "Because lack of probable cause is a required element to prove a § 1983 claim for malicious prosecution in violation of the Constitution, the existence of probable cause defeats the claim." <u>Kjellsen v. Mills</u>, 517 F.3d 1232, 1237 (11th Cir. 2008). "Probable cause exists when the facts and circumstances within the officers' knowledge, of which he or she has reasonably trustworthy information, would cause a prudent person to believe, under the circumstances shown, that the suspect has committed . . . an offense." <u>Miller v. Harget</u>, 458 F.3d 1251, 1259 (11th Cir. 2006) (citation and internal quotation marks omitted); <u>see also</u> <u>Michigan v. DeFillippo</u>, 443 U.S. 31, 37 (1979) (In determining whether an officer had arguable probable cause, we look to the "facts and circumstances within the officer's knowledge."); <u>Abercrombie v. Beam</u>, 728 F. App'x 918, 923 (11th

Cir. 2018). Even "[i]f an officer lacked probable cause to arrest, we must consider whether arguable probable cause supported the arrest at the time." Carter v. Butts Cty., 821 F.3d 1310, 1319 (11th Cir. 2016) (emphasis omitted). "If so, the officer is still entitled to qualified immunity." Id. at 1319; see also Carter v. Gore, 557 F. App'x 904, 908 (11th Cir. 2014).

An officer possesses arguable probable cause if "reasonable officers in the same circumstances and possessing the same knowledge as the [d]efendant[] could have believed that probable cause existed to arrest." Grider v. City of Auburn, 618 F.3d 1240, 1257 (11th Cir. 2010). Thus, even if the officer is mistaken, the cloak of immunity is not lost where his belief was reasonable. Id. Furthermore, an officer may have arguable probable cause that a suspect committed a crime even without "definitive proof that every element of a crime has been established." Abercrombie, 728 F. App'x at 923 (citing Brown v. City of Huntsville, 608 F.3d 724, 735 (11th Cir. 2010)).

Plaintiff supports his claim that Defendant acted without probable cause in obtaining and executing the arrest warrant by arguing: (a) Defendant failed to reasonably investigate (Pl.'s Resp. Opp'n Def.'s Mot. for Summ. J., at 6-10), and (b) Dominguez's testimony was not credible (Pl.'s Resp. Opp'n Def.'s Mot. for Summ. J., at 10-16, 20).

16

a. *Reasonable Investigation*

i. Relevant Case Law

"[A] police officer is not required to explore and eliminate every theoretically plausible claim of innocence before making an arrest." Kingsland v. City of Miami, 382 F.3d 1220, 1229 (11th Cir. 2004) (citation and internal quotation marks omitted). An officer, however, "may not 'unreasonably disregard certain pieces of evidence' by 'choosing to ignore information that has been offered to him or her' or by 'electing not to obtain easily discoverable facts' that might tend to exculpate a suspect." Cozzi v. City of Birmingham, 892 F.3d 1288, 1294 (11th Cir. 2018) (quoting Kingsland, 383 F.3d at 1229, 1233), *cert. denied sub nom.*, Thomas v. Cozzi, 139 S. Ct. 395 (2018). As explained below, Courts in this circuit find officers unreasonably disregard evidence when (1) there is evidence known to the officer or within the officer's field of vision that (2) contradicts the evidence supporting the officer's probable cause belief such that (3) a reasonable officer would have serious doubts as to whether there was probable cause. Only if that is shown do courts state that officers should have continued investigating to discover easily discoverable facts verifying whether the plaintiff-arrestee committed the accused crime. Daniels v. Bango, 487 F. App'x 532, 538 (11th Cir. 2012) (After showing contradictory facts that would have prompted a reasonable officer to continue investigating, the Eleventh Circuit

17

found the officer-defendants' investigation was "cursory" and could have included "simple" techniques to discover "easily discoverable facts" that would have "verif[ied] [the] identification."); see also Abercrombie, 728 F. App'x at 921, 925 (finding contradictory evidence, then finding the easily discoverable evidence included readily-apparent video surveillance and eyewitnesses). Given how fact-intensive this inquiry is, the Court fully examines several relevant cases — which have also been cited by both Parties — in evaluating whether the circumstances in this case show Defendant unreasonably disregarded evidence.

In Daniels, the officer-defendants, acting undercover and "with a hidden surveillance camera," purchased narcotics from a narcotics dealer on July 26, 2007. 487 F. App'x at 533. The dealer did not conceal his face; the purchase lasted twenty minutes; the dealer referred to himself as 'Toe' or 'Tobe'" but later told the officers his first name was James; and the dealer told the officers that he "just got out of jail last night," "went to court today," and faced "'fifteen years'" for 'burglary with a firearm and robbery with a firearm.'" Id. at 533-34. Later that day, the officer-defendants checked the booking blotter for someone with the name James who was booked within the last three months and found James Daniels. Id. at 534. James Daniels was charged with burglary and petit theft, released on July 24, 2007, and sentenced to time served with his case closed. Id. The

officer-defendants stopped their search there even though the only fact that matched the dealer was the name "James," which was a suspect fact given that the dealer referred to himself as "Toe" or "Tobe."

On these facts, the Eleventh Circuit found: "The material inconsistencies between the suspect's story and the information in the search results should have led a reasonable officer to harbor serious doubts about the conclusion that [the plaintiff] was the suspect on the video tape." Id. at 538 (citing, among others, Tillman v. Coley, 886 F.2d 317, 321 (11th Cir. 1989)). These inconsistencies were not noted on the affidavit for the arrest warrant and included that the dealer stated he was released the night before, whereas the plaintiff-arrestee was released two days before and that the dealer said he went to court that morning and was facing punishment of fifteen years, but the plaintiff-arrestee's case was closed after he was sentenced to time served. Id. The affidavit also "omitted the fact that [the officer-defendants] had twenty minutes of close contact with the suspect in broad daylight and with an unobstructed view of the suspect's face." Id.

In Tillman, the officer-defendant was told the drug dealer appeared to be a twenty-four-year-old who identified herself as Mary Tillman. 886 F.2d at 318. The officer-defendant arrested a Mary Tillman he knew who was forty-one years old. Id. The Eleventh

19

Circuit held that the officer-defendant lacked arguable probable cause because the officer could see that the age of the plaintiff-arrestee contradicted the known evidence and a reasonable officer would have investigated the age discrepancy. Id. at 321; see also Cozzi, 892 F.3d at 1297 (finding no arguable probable cause because officer-defendant "had been told the readily verifiable exculpatory fact that the perpetrator's multiple tattoos did not match [the plaintiff-arrestee]'s single tattoo"; thus, the tattoos amounted to "plainly exculpatory and easily verifiable information" that the officer "unreasonably disregarded").

The Eleventh Circuit has also made the understandable point that it is impossible for an officer to unreasonably disregard facts that are unknown to him or her. For example, in Damali v. City of East Point, the plaintiff-arrestee argued the officer, instead of basing his arrest only on the fact that his name was the same name provided by the arrested robber, could have conducted minor inquiries to corroborate the identification. 766 F. App'x 825, 828 (11th Cir. 2019). The Eleventh Circuit disagreed because there was no evidence the officer ignored contradictory information that was offered to him or investigated in a biased fashion. Id. (citing Kingsland, 382 F.3d at 1229).

That brings the Court to two cases cited by the Parties where there was evidence of officer bias. In Kingsland, the plaintiff-arrestee and an off-duty officer were in a car accident. 382 F.3d

at 1223. The plaintiff-arrestee alleged it was the off-duty officer's fault. Id. The off-duty officer argued the reverse and additionally claimed he smelled cannabis on the plaintiff-arrestee's person and in her vehicle. Id. The plaintiff-arrestee offered evidence raising issues of fact as to whether the officer-defendants conducted a biased investigation. Id. at 1231. Bias was shown because the officer-defendants were faced with two accounts of what occurred, accepted one account with no investigation, and chose to either ignore facts contradicting or misrepresent the facts supporting the believed account. Id.

To demonstrate the officer-defendants ignored contradictory facts, the plaintiff-arrestee showed there was no evidence she had drugs on her person or in her vehicle; thus, it was unlikely the officer-defendants smelled "a strong odor of cannabis emitting from her breath," as was stated in the arrest warrant. Id. at 1224 n.5, 1225, 1228. Consequently, evidence revealed the officer-defendants knew facts contradicted their accusation that the plaintiff-arrestee used cannabis, making the "information on which the[] [officers-defendants] base[d] their arrest less than 'reasonably trustworthy' under the circumstances." Id. at 1231. Given the contradictory evidence, a reasonable officer would have searched the vehicle for the illicit substance, used drug-sniffing dogs, or interviewed the readily available eyewitnesses. Id. at 1228, 1231. Supporting the allegation that the officer-defendants

misrepresented facts, the plaintiff-arrestee additionally showed that the arrest warrant charged driving under the influence of alcohol until her "[b]reathalyzer results came back" negative, at which point "[t]he second officer told the first officer to write that [the plaintiff-arrestee] had a strong odor of cannabis emitting from her breath. At that point, the first officer threw away the form he was writing on and started writing a new form." Id. at 1224.

The facts in Abercrombie are similar to Kingsland. The officer-defendant arrived to the AAMCO store, the scene of an alleged "fight"; only interviewed the self-proclaimed victim and her fiancé, who reported the plaintiff-arrestee "had thrown a document at her and struck her"; and then arrested the plaintiff-arrestee on that alone. 728 F. App'x at 920. The Eleventh Circuit found evidence contradicting the victim's story that would have prompted a reasonable officer to "'investigate objectively' and clarify the factual situation." Id. at 925 (quoting Kingsland, 382 F.3d at 1229). The contradictory evidence was that, first, even though the alleged victim claimed she was afraid of the plaintiff-accused, the officer-defendant saw her standing near the plaintiff-arrestee and, second, eyewitnesses "were confused as to why [the plaintiff-arrestee] was being handcuffed." Id.

ii. Factual Application of Relevant Case Law

Applying the above case law, the facts offered by Plaintiff are not contradictory such that Defendant lacked probable cause to believe Plaintiff assisted in the break-ins. (Pl.'s Resp. Opp'n Def.'s Mot. for Summ. J., at 9.) For example, first, Dominguez being the only person who used Cards 1 and 2 does not foreclose the possibility that Plaintiff assisted in the break-ins. (See id.) Second, Plaintiff not having a car or driver's license does not make it impossible that he purchased gas at the Raceway gas station after the break-ins as claimed by Dominguez. (See id.) Third, Plaintiff not possessing any stolen goods does not mean he did not participate in the break-ins because he could have sold the goods directly to others or allowed Dominguez to retain them. (See id.) Fourth, the fact that Dominguez claimed responsibility for the items reported stolen does not foreclose the possibility that other items were taken but not reported stolen. (See id.) As to this fourth point, Dominguez does not claim responsibility for all the items that were reported stolen. Dominguez did not remember taking a watch, but a Tag Heuer watch was reported stolen. (Dominguez's Int., at 36:38–36:45.) Dominguez also claims to have stolen items that were not reported stolen. Dominguez admits to taking gift cards, yet no gift card was specifically reported as stolen. (Id. at 37:00–37:14.)

The only evidence potentially revealing Plaintiff did not commit the crime was that the dates Plaintiff provided were incorrect. Plaintiff initially met up with Dominguez on the Tenth, not the Eleventh. Prior to Plaintiff's arrest, Defendant was aware that Dominguez's mother booked a room at the Masters Inn from June 10, 2015, to June 12, 2015. No video was available to verify who used the room on which dates. Plaintiff told Defendant that the day he met up with Dominguez in Augusta was the first day he arrived, and Dominguez confirmed he met up with Plaintiff the first night he was in town. (Dominguez's Int., at 1:12:15.) There is an inconsistency, then, about the date Dominguez's mother held the room at the Masters Inn for and whether that means Plaintiff and Dominguez were together on June 11, 2015. The question, then, is whether that discrepancy would require a reasonable officer to further investigate whether Plaintiff committed the crime.

The difference in dates that Dominguez's mother held the room at the Masters Inn for raises suspicion about the date Plaintiff and Dominguez were together. During his interview of Plaintiff, Defendant requested Plaintiff to verify the dates, but Plaintiff could not because he deleted his phone logs. Although this inconsistency is more than what was seen in Damali, this inconsistency does not reach the level of those in the other cases identified above. Here, the contradictory information did not directly contradict key facts regarding the identity of the

24

perpetrator, nor did it concern whether a crime was actually committed. The contradictory information raised by Plaintiff is information inconsistent with one piece of circumstantial evidence; it does not directly contradict evidence revealing Plaintiff was with Dominguez the early morning of the Twelfth.

Even if this inconsistency would lead a reasonable officer to continue investigating, Defendant continued to investigate. He first attempted to gain location data from Plaintiff's cell phone, which was, unfortunately, unavailable. Defendant then interviewed Dominguez who provided credible testimony[4] implicating Plaintiff in the break-ins and confirming Plaintiffs' timeline. Given the information Defendant's additional investigation provided, the Court finds Defendant further investigated the inconsistency and the additional evidence provided arguable probable cause to believe Plaintiff assisted in the break-ins. As such, at this point, Defendant still retains immunity as to Plaintiff's federal malicious prosecution claim.

b. *Credibility of Dominguez's Testimony*

Plaintiff argues Defendant could not rely solely on Dominguez's testimony for probable cause to arrest Plaintiff. Plaintiff cites the rule from Ortega v. Christian that "making a statement against one's penal interests without more will not raise

---

[4] The credibility of Dominguez's testimony is analyzed *infra* Section (III)(A)(i)(b).

an informant's tip to the level of probable cause required under the Fourth Amendment." 85 F.3d 1521, 1525 (11th Cir. 1996); (Pl.'s Resp. Opp'n Def.'s Mot. for Summ. J., at 10). As pointed out by Defendant, Dominguez is not an informant, but a co-defendant who was directly involved in the crime. The standard is different for one who allegedly knows information about a defendant's involvement in a crime, i.e., an informant, and one who was an accomplice in the crime facing punishment.

As stated by the Eleventh Circuit, "[O]ur longstanding circuit precedent is clear that uncorroborated testimony from an admitted accomplice is sufficient to support probable cause, 'unless it is incredible or contradicts known facts to such an extent no reasonable officer would believe it.'" Damali, 766 F. App'x at 827 (quoting Craig v. Singletary, 127 F.3d 1030, 1045, 1045-46 (11th Cir. 1997)). In Damali, the plaintiff-arrestee argued the officer-defendant unreasonably relied on the robber's statements because one of her statements "contradicted known facts." Id. at 828. The robber told the officer-defendant that a Mr. Damali was an accomplice in the robbery and that she had a long criminal relationship with Mr. Damali. Id. The officer-defendant, however, then arrested a Mr. Damali — the plaintiff-arrestee — who he knew had no criminal record. Id. The Eleventh Circuit discussed that there are reasonable ways of interpreting the robber's allegation that make the allegedly contradictory

26

information not contradictory.  Specifically, the robber providing that "she had a long criminal relationship with Mr. Damali does not necessarily mean that the suspect she identified would have actually possessed a criminal record."  Id.

The Court reiterates that Defendant did not rely solely on Dominguez's testimony, but also interviewed Plaintiff, who informed Defendant that he was with Dominguez around the time the crime occurred; reviewed the Masters Inn records, which showed Dominguez's mother indeed held a room from June 11, 2015, through June 12, 2015; and analyzed the phone records that showed Plaintiff and Defendant were in frequent communication around the days of the break-ins.  Further, Defendant's investigation confirmed many of the details of Dominguez's story.  In this section, however, the Court focuses on Dominguez's testimony alone to determine whether "it is incredible or contradicts known facts to such an extent no reasonable officer would believe it."

Plaintiff argues Dominguez's testimony is not credible for four reasons:

    (1)    Dominguez did not offer information unless prompted by [Defendant] to implicate [Plaintiff] by asking leading questions;

    (2)    Dominguez displayed personal animosity toward [Plaintiff], which [Defendant] manipulated and further incited;

    (3)    Dominguez showed that his statements, in an attempt to cooperate were motivated by self-interest and a lesser sentence; [and]

(4)  Dominguez made many statements that [Defendant] knew were false and showed that Dominguez was not credible.

(Pl.'s Resp. Opp'n Def.'s Mot. for Summ. J., at 14.)  The Court addresses each challenge in turn.

Plaintiff expands on the first challenge by pointing out Dominguez's initial hesitation to name Plaintiff. (Id.) Plaintiff cites two non-binding cases for the proposition that a co-defendant hesitating before naming an alleged accomplice may make it so that no reasonable officer would believe the testimony. (Id. at 11-12.)  First, in Reynolds v. City of Daytona Beach, the district court found the plaintiff-arrestee "set forth sufficient allegations to survive [the] [d]efendants' motion to dismiss" as to the plaintiff's false arrest claim.  No. 6:18-cv-1921-Orl-28LRH, 2019 WL 2412433, at *6 (M.D. Fla. May 22, 2019).  The plaintiff was arrested for physically assaulting his granddaughter by striking her in the face with a slipper.  Id. at *2.  The district court reasoned that "it could be concluded that [the officer-defendant] lacked both probable cause and arguable probable cause to effect [the] arrest" if either: (a) the officer-defendants "coaxed the [alleged victim] to state that [the plaintiff-arrestee] struck her with a shoe," which was alleged in the complaint; or (b) if the officer "knew that the [alleged victim's] story was false."  Id. at *6.  The district court explained the facts that could allow a reasonable person to find

the officer "knew" the story was false: "[the alleged victim] was (1) hesitant with her responses, (2) initially did not state that any physical contact occurred, and (3) provided three different versions of the story." Id. The complaint further offered many examples of how it was visible at the scene that the alleged victim's story was false, such as the fact that the officer "observed no physical injury to the [alleged victim]'s face" and that the plaintiff "was old and frail, and unlikely to be able to take a shoe from [the alleged victim]'s foot, who was much younger and mobile." Id. In sum, the Court showed that the alleged victim's story changed multiple times and physical evidence at the crime scene conflicted with the alleged victim's story.

Second, Plaintiff cites Hill v. New Orleans City, where the district court found the plaintiff-arrestee survived summary judgment on the Fourth Amendment claim because the facts the officer-defendant omitted from the affidavit "certainly appear[ed] to have been the result of deliberate manipulation in order to secure a finding of probable cause." No. 13-2463, 2015 WL 222185, at *12 (E.D. La. Jan. 13, 2015). The facts omitted were not just that the witness hesitated before identifying the plaintiff, but also that there was an exculpatory identification by the rape victim and physical evidence at the crime scene tending to show the plaintiff-arrestee was not the rapist. Id. The fact that the

victim hesitated was not enough on its own to raise an issue as to whether there was arguable probable cause.

Here, the fact that Dominguez hesitated at first before implicating Plaintiff does not make his testimony incredible especially because Defendant had proof the two associated around the days of the crime and that Plaintiff offered dates placing Plaintiff with Dominguez the night of the crime. In response to Defendant inquiring about the first time Dominguez saw Plaintiff, Dominguez did state, "[I]t was a couple weeks before that." (Dominguez's Int. at 1:12:20-40.) It is unclear what Defendant is referring to here because he otherwise consistently states he saw Plaintiff when he came to Augusta around June 11, 2015. Plaintiff also argues Dominguez said Plaintiff "took about a two-hour break during the robbery, which [Defendant] knew lasted only about two hours." (Pl.'s Resp. Opp'n Def.'s Mot. for Summ. J., at 14.) The testimony clearly states as follows:

Defendant: "And [Plaintiff] was with you for the entire Ramsgate?"

Dominguez: "He went back to the car for about two hours afterwards. Said he was tired."

The Court's job is not to determine what Dominguez intended to say or all potential interpretations of his statement. Rather, the Court's job is to determine whether Defendant's interpretation was unbiased and reasonable. See Damali, 766 F. App'x at 828. It is

30

more than reasonable that, here, Dominguez said Plaintiff went back to the car after two hours of breaking into vehicles. Further, later in the interview, Dominguez stated something mumbled, which Defendant immediately repeated as Dominguez stating that Plaintiff "topped out after a couple hours. Sat in the car and waited." (Dominguez's Int., at 1:13:18–1:13:27.)

In Rodriguez, there was no evidence that the alleged victim had been struck apart from the alleged victim's statement to that affect, which only came out after multiple interviews with the officer. Furthermore, the accused consistently and clearly denied physically touching the alleged victim. In contrast, here, there is hesitation by Dominguez before implicating Plaintiff, Plaintiff's own testimony placing him with Dominguez on the early morning of the 12th, and two statements by Dominguez that reasonably do not contradict any known facts. These facts do not rise to the level of finding Defendant "knew" Dominguez's testimony was false.

As to Plaintiff's second challenge, Plaintiff cites no authority showing that animosity towards the named co-defendant makes the testimony incredible. The court in Craig addressed Plaintiff's third argument:

> [E]ven when a co-defendant's confession seeks to shift some of the blame to another, the co-defendant's admission of guilt to the core crime is enough indication of "reasonably trustworthy information" to satisfy probable cause. . . . Ordinarily, unless it is

incredible or contradicts known facts to such an extent no reasonable officer would believe it, a co-defendant's confession that he and the suspect committed the crime can supply probable cause to arrest the suspect.

127 F.3d at 1045-46. Thus, the fact that there may be some self-interest in shifting the blame does not, on its own, make the testimony incredible. Furthermore, Plaintiff seems to argue Dominguez made statements about Plaintiff "in pursuit of a lesser sentence" (Pl.'s Resp. Opp'n Def.'s Mot. for Summ. J., at 15-16), however, the discussion Plaintiff refers to was only related to drug activity in Gwinnett County and not related to the break-ins.[5] (Dominguez's Int., at 1:20:15-1:22:00.) Thus, there is no evidence that Dominguez implicated Plaintiff in the break-ins in an informant capacity.

Turning to Plaintiff's final argument, the Court must determine whether Dominguez's testimony "contradicts known facts to such an extent no reasonable officer would believe it." Craig, 127 F.3d at 1045. Plaintiff offers four pieces of evidence that allegedly contradict known facts and two pieces of evidence that Dominguez's testimony was unreliable because of memory difficulties. (Pl.'s Resp. Opp'n Def.'s Mot. for Summ. J., at 16.) The first two pieces of evidence offered by Plaintiff in this section are not contradictory; they show Dominguez trying to shift the blame. The Court refers back to Section II(A)(1)(a)(ii)

---

[5] To protect any persons potentially implicated by this informant discussion, the Court includes only limited analysis concerning this point.

regarding Plaintiff's third and fourth pieces of allegedly contradictory evidence: (3) That Dominguez claimed responsibility for the items reported stolen; and (4) That "Dominguez alleged that [Plaintiff] used one of the stolen credit cards to buy gas. . . . However, [Defendant] knew or must have known that [Plaintiff] did not own a vehicle or have a valid drivers license." (Id.)

The final two pieces of evidence allegedly show Dominguez's statements were unreliable because of memory difficulties. (Id.) The first is that Dominguez stated he did not immediately remember the number of vehicles he broke into. (Id.) Moments later, however, Dominguez rejected Defendant's offered answer of "four or five" cars and stated it was "ten, eleven, twelve. Something like that." (Dominguez's Int., at 1:13:03-1:13:15.) Second, Plaintiff states Dominguez's testimony is unreliable because when Defendant asked what he remembered "near the Eleventh? Or before? . . . Two weeks [b]efore? A month before?," Dominguez responded, "[L]ike I said, I don't remember that far back." (Pl.'s Resp. Opp'n Def.'s Mot. for Summ. J., at 16 (quoting Dominguez's Int., at 39:31-39:51).) Dominguez, however, offered many details about his time in Augusta, so the argument that Dominguez genuinely could not remember what happened is unfounded even if he struggled at times to remember specifics. After evaluating Plaintiff's arguments that Dominguez's testimony was unreliable, the Court finds that

33

there is insufficient evidence to show it was so unreliable as a matter of law that no reasonable officer would have believed him. As such, Defendant still retains his shield of immunity.

## 2. Fabrication of Evidence

Lastly, Plaintiff argues Defendant is not entitled to qualified immunity because Defendant fabricated evidence on the arrest warrant. (Pl.'s Resp. Opp'n Def.'s Mot. for Summ. J., at 20-22.) As an initial matter, there are two arrest warrants in the record, and the Parties dispute which arrest warrant is official. Defendant's Exhibit C (Doc. 14-4) is a signed and sealed affidavit and arrest warrant ("Arrest Warrant") whereas Plaintiff's Exhibit G (Doc. 25-5, at 31-32) is an unsigned and unsealed warrant application ("Warrant Application"). Although the Court must view the evidence in the light most favorable to the non-movant Plaintiff, there is no evidence that the Warrant Application was used to obtain the Arrest Warrant. Plaintiff argues that there is "a reasonable inference" that the Warrant Application could be reduced to admissible form at trial because Defendant "could testify as to whether he signed it." (Pl.'s Sur-Reply Opp'n Def.'s Mot. for Summ. J., at 16, 16 n.10.) Plaintiff did not depose Defendant to determine whether the unsigned and unsealed Warrant Application was used in obtaining the Arrest Warrant. Unlike Plaintiff's apparent assertion that the significance of the Warrant Application "lies solely in the fact

that it was made" (see id. at 16 n.10), the significance of the Warrant Application is only in its use in obtaining the Arrest Warrant. Plaintiff's argument that the Warrant Application being in the case file "raises a reasonable inference that [Defendant] submitted it" is lacking at this stage. (Id. at 16.)

Nevertheless, even were the Court to consider the Warrant Application, the Court finds Defendant did not fabricate evidence. Plaintiff does not argue that the evidence within the Warrant Application does not amount to probable cause.[6] Rather, Plaintiff argues that certain pieces of evidence contained within the Warrant Application are fabricated.

"[I]t is a violation of the Fourth Amendment's protections against unreasonable searches and seizures for an officer to present false information to a judicial officer in support of a warrant application." Slater v. Henderson, No. Civ.A. 5:03-CV-241, 2006 WL 1517068, at *1 (M.D. Ga. May 24, 2006). Thus, officers are not entitled to qualified immunity if they "fabricated or unreasonably disregarded[7] certain pieces of evidence to establish

---

[6] Plaintiff does argue that Defendant omitted evidence in the Warrant Application "showing [Defendant] knew Dominguez's implication of [Plaintiff] was unbelievable." (Pl.'s Resp. Opp'n Def.'s Mot. for Summ. J. at 21-22.) This additional evidence is similar to that offered by Plaintiff previously in an attempt to show Defendant lacked arguable probable cause. See Carter, 557 F. App'x at 908 ("[S]tatements made in support of a warrant need not actually be true, but they needed 'to be "truthful" in the sense that the information put forth is believed or appropriately accepted by the affiant as true.'") (quoting Franks v. Delaware, 438 U.S. 154, 166 (1978)). Because the Court already considered whether this additional evidence shows Defendant did not have arguable probable cause, the Court refers to its previous discussion.
[7] See supra note 6.

probable cause or arguable probable cause." <u>Kingsland</u>, 382 F.3d at 1233. The Supreme Court in <u>Franks</u> provided that a warrant is void if the warrant includes "a false statement [made] knowingly and intentionally, or with reckless disregard for the truth" and "the allegedly false statement is necessary to the finding of probable cause." 438 U.S. at 155-56. To prevail on his claim that Defendant fabricated evidence, then, Plaintiff must show Defendant included the allegedly false information in the arrest warrant either knowingly and intentionally or with reckless disregard for the truth.

Plaintiff argues Defendant fabricated two pieces of evidence. First, Plaintiff claims that "Dominguez never suggested that they 'went through the neighborhood breaking into vehicles together.'" (Pl.'s Resp. Opp'n Mot. for Summ. J., at 21.) Second, Plaintiff argues that there is no evidence "the robbery was in Ramsgate neighborhood 'because' they used to hang[]out near there.'" (<u>Id.</u>) After examining the record, the Court finds sufficient evidence showing Defendant reasonably believed both asserted facts.

First, Plaintiff challenges not the truth of Dominguez's statements, but that Dominguez never made the asserted statement at all. Throughout his interview, however, Dominguez suggested Plaintiff was with him during the break-ins working the other side of the street. (<u>See, e.g.</u>, Dominguez's Int., at 30:50-31:01, 36:40, 37:45-38:18, 1:12:50-1:13:15.) Although Defendant used

36

different words than Dominguez, Dominguez clearly named Plaintiff as being with him during the break-ins. Thus, Plaintiff is incorrect when stating Dominguez never made the asserted statement.

Second, Plaintiff challenges the specific assertion that the break-ins were on Ramsgate Drive "because" Plaintiff and Dominguez used to hang out there. The Court finds that it was not unreasonable for Defendant to believe Plaintiff and Dominguez had a connection to Ramsgate Drive or the adjoining neighborhood. During Plaintiff's interview, it was discussed that Dominguez's brother used to live in that neighborhood and that Plaintiff used to hang out there with Dominguez. (Pl.'s Int. Pt. 2, at 18:20–18:30; see also Dominguez's Int., at 30:40–30:50.) Furthermore, Plaintiff told Defendant that Dominguez broke into cars on Ramsgate Drive many years prior to the incident in question. As such, it was not unreasonable for Defendant to believe Plaintiff and Dominguez returned to Ramsgate Drive because of their past connection to the area.

Having found the above, the Court finds that even if the Court accepts the unsigned and unsealed Warrant Application, Defendant did not fabricate any evidence therein used to establish probable cause. As such, Defendant maintains qualified immunity as to Plaintiff's federal malicious prosecution claim.

**B. State Malicious Prosecution Claim**

Because the Court finds Plaintiff's federal law claim fails, the Court declines to exercise supplemental jurisdiction over Plaintiff's state law claim under 28 U.S.C. § 1367. See Raney v. Allstate Ins. Co., 370 F.3d 1086, 1089 (11th Cir. 2004) ("We have encouraged district courts to dismiss any remaining state claims when, as here, the federal claims have been dismissed prior to trial.") As such, Plaintiff's state law claims are **REMANDED** to the State Court of Richmond County, Georgia.

## IV. CONCLUSION

For the foregoing reasons, Defendant's motion for summary judgment (Doc. 14) is **GRANTED** as to Plaintiff's federal law claims. The Court **REMANDS** Plaintiff's state law claims to the State Court of Richmond County, Georgia. As no claims remain, the Clerk is directed to **ENTER JUDGMENT** in favor of Defendant, **TERMINATE** all other pending motions, if any, and **CLOSE** this case.

**ORDER ENTERED** at Augusta, Georgia, this 23rd day of March, 2020.

J. RANDAL HALL, CHIEF JUDGE
UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF GEORGIA